FRED W. JONES, Jr., Judge.
The subrogated insurer of a cottonpicking machine sued the manufacturer for the amount plaintiff paid its insured following the loss by fire of the cotton picker because of an alleged manufacturing defect. From a judgment rejecting its demands, plaintiff appealed. We affirm.
On September 27, 1977 Eugene Stanley purchased from Scott Truck & Tractor Company of Delhi, Inc., a cottonpicking machine that had been manufactured by International Harvester Company. The cotton picker was insured against loss by fire under a policy issued by plaintiff.
Stanley, who had been in the business of picking cotton by machine for about two years, used his new machine to pick cotton on an 18 acre tract and then on a 200 acre tract. He next moved to the Hendrix farm to go back over a 75 acre tract which he had previously picked — an operation described as “scrapping”. In connection with this job the cotton picker was used “around the clock” — 24 hours a day.
At about 9:00 P.M. on October 28, 1977 Stanley had almost completed this job (lacking only two or three acres) when he noticed the cotton picker “lug down” or quit pulling momentarily. Reaching over to lift the “heads”, Stanley glanced down through a glass plate in the cab floor and observed a fire under the cab. He immediately stopped the machine, cut off the engine, exited the cab and jumped to the ground. Looking back, he saw fire going up into the cab and smoke billowing from the cotton picker, which was ultimately deemed a total loss due to the fire. This litigation ensued.
Rejecting plaintiff’s demands, the trial judge stated in oral reasons for judgment that plaintiff had failed to prove the existence of a manufacturing defect by a preponderance of the evidence.
Plaintiff’s principal complaints on appeal are that the trial judge erred in failing to find (1) that the fire itself was proof of a defect; (2) that the destruction of the machine was caused by a defectively manufactured or defectively installed fuel line; and (3) even if the cotton picker was free of defects, defendant was negligent in failing to warn of the fire hazard and to install fire suppression equipment on the cotton picker.
Media Production Consultants, Inc. v. Mercedes-Benz of North America, 262 La. 80, 262 So.2d 377 (1972) established a “consumer protection rule” in Louisiana, based upon the Civil Code redhibition articles,[1] that imposed strict liability upon a manufacturer for the loss of the manufactured article due to a manufacturing defect, despite a lack of privity between the claimant consumer and the manufacturer.
This rule was adhered to in Rey v. Cuccia, 298 So.2d 840 (La.1974), which involved a consumer suit against the manufacturer and retail seller to recover the purchase price of a camper trailer that came apart after some 200 miles of use. Elaborating upon the method of proving a redhibitory defect in cases of this nature, the court explained:
*618 “[e]ven where the defect appears more than three days after the sale ... if it appears soon after the thing is put into use, a reasonable inference may arise, in the absence of other explanation or intervening cause shown, that the defect existed at the time of the sale.
“The failure to prove inadequate welding to be the cause of the trailer break-up does not defeat the buyer’s cause of action. If the purchased vehicle breaks up soon after it is put into use, then this in itself (in the absence of other cause shown) may be evidence of a redhibitory defect, without the buyer being held to prove the specific cause of the vehicle’s break-up.”
In order to discharge its burden of proving a defect in the manufacture of the cotton picker, plaintiff offered the testimony of Norman Sachnik, a consulting engineer. Sachnik had considerable experience in the investigation of equipment loss due to fire, but conceded that his familiarity with mechanical cotton pickers was limited.
During the course of an intensive inspection of the engine compartment of the damaged cotton picker, Sachnik noticed distinctive burn patterns around one of the fuel lines and its injector, with evidence of particularly deep oxidation on the fuel line and a “hot spot” on the engine adjacent to that injector head: He surmised that there was possibly a fuel leak where the fuel line joined the injector.
Further testing led Sachnik to the conclusion that, in manufacturing this particular cotton picker, defendant’s employees had connected the fuel line in question to the injector at such an angle as to make it susceptible to fuel leakage over a period of time — as indicated by a dark, black color evidencing oxidation of the surface of the fuel line under extremely high temperature. Finally, it was Sachnik’s expert opinion that the fire started in the engine compartment of the cotton picker when either a “shorted” battery cable or heat from the manifold set fire to cotton lint which then worked its way around the engine to ignite fuel-soaked trash lying next to the defectively joined. fuel line and injector. Thereafter the fire spread simultaneously forward and backward under the cab.
To refute Sachnik’s theory concerning the origin of the fire, defendant offered the expert testimony of three of its employees.
Henry Dalloz, products performance engineer for defendant, explained that a mechanical cotton picker is a self-propelled implement with two drums or headers at the front end. Each header has 1120 spindles which turn on a plane, go into the cotton plant and selectively pick off the cotton, come back out and move around to a circular rubber pad called a “doffer”— which rubs the cotton off the spindles and drops it behind the header next to a rear door where the cotton is sucked up by an air system and dropped into a large basket. A hydraulic reservoir located adjacent to the engine firewall carries 15 gallons of oil that supplies the hydraulic system through rubber hoses.
Dalloz pointed out that, in the operation of a mechanical cotton picker, an accumulation of cotton and trash sometimes occurs in the rear doors of the headers. This choke might be severe enough at the beginning to activate a device which prevents the spindles from continuing to rotate. On the other hand, a less severe choke could lead to a gradual buildup of material back into the doffer area, where the doffers would spin it, causing friction and possibly a fire. The manufacturer had installed a glass plate in the cab floor to enable the machine operator to look down into the headers to see whether the material was flowing properly or whether a choke was developing.
Dalloz’s inspection revealed that there was more fire damage on the right side of the cotton picker than on the left. He observed that the right header appeared to have residue cotton and charred material at the bottom while the left header simply contained unburned cotton lint. He noted no fire damage to the battery cable inside the firewall near the battery nor any fire damage on the exhaust manifold side of the engine — tending to refute Sachnik’s theory concerning the possible ignition points of the fire.
*619 It was Dalloz’s opinion that the fire resulted from a choke in the right header, consistent with the operator’s testimony that he looked down through the glass plate and saw fire concentrated to the rear of that header. Dalloz theorized that this fire would have spread through the hoses carrying fuel and would have been moved up and to the rear by the air conveyance system.
Dalloz explained that a choke was more likely to occur in a “scrapping” operation than in a regular one because the operator does not have to be as careful with the cotton plants (which have already been picked once), can operate his machine at a faster pace, and is more likely to pick up trash and sticks, which have a great potential for forming chokes.
D. G. Mittlestaedt, whose duties with defendant included failure analysis of diesel engines, examined the fuel line and fuel injector in question and testified that, contrary to Sachnik’s assertion, there was no defect in the joining of the two that caused a fuel leak. In fact, Mittlestaedt stated that the fuel line was so designed that it could be connected to the injector at a slight angle, without having to be perfectly seated, to form a seal.
Mittlestaedt tested fuel lines in three cotton pickers then in use, found that none leaked, removed and brought them to court and demonstrated that all had about the same angularity in the connection with their injectors as the fuel line in question.
Noting the testimony of the operator that his machine was running smoothly just pri- or to the fire, Mittlestaedt observed that if there had been a fuel leak the engine would “have missed like crazy.”
James M. Francis, a manager at defendant’s Memphis plant which manufactured the machine involved in this litigation, also found no evidence of a defective connection between the fuel line and fuel injector in this cotton picker — pointing out that the angularity of the seating line was insignificant. He agreed with Mittlestaedt that a fuel leak would have caused the engine to misfire or lose power before the fire — which the operator testified did not happen.
Francis pointed out to the trial court that the rubber covering on the battery end of the battery cable was intact and showed no heat damage — in refutation of Sachnik’s speculation that the fire might have started there.
Reasoning from the operator’s statement that he looked down through the glass plate in the cab floor and saw the fire, and photographic evidence showing fire damage through the entire duct work from the header up into the forward discharge area of the cotton-holding basket itself, Francis concluded that the fire originated in a choke behind the right header, caused by friction between the doffer and accumulated material which ignited flammable cotton in that area. He noted that the right rear outlet on the right header showed an accumulation of burned debris several inches thick — unlike the left header. If this right header had been operating in a normal manner, Francis said that the area containing the debris would have been cleaned by the air conveyor system.
Francis explained that a fire behind the right header would likely become extremely intense because of the forced draft imposed upon the material by the air current and the duct work itself. It was reasonable to assume, according to him, that the burning material was immediately drawn through the duct work up into the forward part of the basket designed to hold cotton. Francis postulated that the updraft of the fire also enveloped the cab and destroyed the windshield.
Under the Rey ruling plaintiff was not required to prove the specific cause of the fire that destroyed the cotton picker. The mere occurrence of a fire during routine operation of the machine some 30 days after its purchase could give rise to a reasonable inference that it resulted from a manufacturing defect — in the absence of “other explanation or intervening cause shown.” See Rey, supra, p. 843. However, here the trial judge found “another explanation” and we cannot say that he was clearly wrong in his fact-finding, based *620 upon an evaluation of the evidence, that the fire started in the right header due to a choke rather than in the engine compartment because of a defective fuel line connection with the fuel injector. Since there was no evidence that the choke resulted from a manufacturing defect, the trial judge correctly held that plaintiff failed to prove an essential element of its case (the existence of a redhibitory defect) by a preponderance of the evidence.
Plaintiff’s alternative contention, that defendant was negligent in failing to warn that a small header fire could escalate into a conflagration and in failing to equip the machine with fire suppressing equipment, is without merit. It seems obvious that, because of various hoses carrying fuel to different parts of the cotton picker and because of the air current in the air convey- or system, any small fire would conceivably escalate into a larger one. With reference to the absence of fire suppressing equipment, there was no evidence of any device with which the cotton picker might have been fitted to prevent the ignition of choke fires. The manufacturer did recommend acquisition by machine operators of small portable fire extinguishers for use in suppressing fires in the engine compartments. This option, of course, would rest with the purchaser of the cotton picker.
On incidental issues, we do not find the trial judge abused his discretion in accepting Dalloz as an expert witness, in view of his professional qualifications, training and experience. See La.R.S. 15:466. Nor do we find that the trial judge abused his wide discretion in refusing to allow additional rebuttal testimony by Sach-nik, since the tendered evidence was largely cumulative.
For the reasons set forth, we affirm the judgment of the district court, at appellant’s cost.

. Under La.C.C. Arts. 2475, 2476 and 2520 the seller is bound by an implied warranty that the thing sold is free of hidden defects and is reasonably fit for the product’s intended use.